A. Douglas THOMPSON, Plaintiff,

v.

The CITY OF PORTLAND, Richard Olson, Franklin Noiles and Stephen Robinson, Defendants.

Civ. No. 83–0028–P.

United States District Court, D. Maine.

Oct. 22, 1985.

Robert Avaunt, Zuckerman & Avaunt, Gray, Me., for plaintiff.

William J. Kayatta, Jr., Pierce Atwood, Portland, Me., for defendants Noiles, Olson & Robinson.

Charles A. Lane, Portland, Me., for City of Portland.

### OPINION AND ORDER

GENE CARTER, District Judge.

*Findings of Fact*

On December 3, 1980, Plaintiff, a brittle, Type 1, blind diabetic, traveled on a Greyhound Bus from Machias, Maine to Portland, Maine. He wore a Medic-Alert necklace identifying himself as a blind diabetic who had recently received a kidney transplant. Protruding from his traveling bag was a collapsible white cane and in his shirt pocket was a bottle of reactose, a drug for treating insulin shock. Plaintiff wore two glass eyes which concealed, at least to passing view, that he is sightless. Although the bus driver operating the bus from Machias to Bangor knew of Plaintiff's impairments, the replacement driver who boarded at Bangor did not. Sometime en route from Bangor to Portland, Plaintiff experienced an insulin shock reaction which was ongoing at the time the bus arrived in Portland. Because of the insulin shock, Plaintiff remembers nothing of what occurred until he awakened in a police cruiser on the way to the Cumberland County Jail.

At about 3:00 a.m. on December 31, after arriving at the bus depot in Portland, the bus driver realized that one person who was supposed to disembark there was unaccounted for. He asked Plaintiff if he wished to get off in Portland and Plaintiff responded "yes." When Plaintiff failed to move, the bus driver asked him again, five or six times, if he wanted to get off in Portland, and each time Plaintiff said that he did. He did not move, however. Finally, the bus driver warned Plaintiff that he would ask only one more time, at the rest stop at a Dunkin' Donuts, and if Plaintiff again failed to get off, he would call the police. Plaintiff again said he wanted to get off in Portland. A few minutes later

the scene was repeated at Dunkin' Donuts and the bus driver called the police.

Three police officers responded to the call, defendant officers Franklin Noiles and Steven Robinson, and their supervisor, Defendant Richard Olson. Arriving slightly before the other two, Officer Robinson boarded the bus and found Plaintiff slumped in his seat, looking asleep. When Officer Robinson spoke to him and tried to rouse him, Plaintiff murmured incoherently and was generally unresponsive. Although there had been no mention of alcohol by the bus driver or any of the other passengers, nor any bottles or alcoholic odor present, Officer Robinson assumed that Plaintiff was drunk. When Officer Noiles and Sergeant Olson arrived, Officer Robinson told them that there was a passenger on the bus who refused to leave. After assessing the situation, Sergeant Olson identified himself as a police officer and told Plaintiff that he would have to get off the bus. Plaintiff, whose eyes were open at that time, replied, "I will, I will," but did not move. Sergeant Olson repeated himself and again Plaintiff responded, "I will, I will," without moving. Sergeant Olson also thought that Plaintiff was drunk or perhaps suffering from a drug reaction. Sergeant Olson began to shake Plaintiff, telling him that he would have to get off the bus. Having been previously motionless, at this point Plaintiff began to flail his arms. Sergeant Olson and Officer Noiles then restrained Plaintiff's arms and moved him to the aisle on his knees, where they handcuffed him. At this time, Plaintiff was under arrest. Olson again told Plaintiff that he was a police officer and that Plaintiff should leave the bus, and Plaintiff once again replied, "I will."

Following what Officer Robinson described as standard procedure when dealing with an intoxicated individual, the officers tried to stand Plaintiff up. Officer Robinson explained that intoxicated people often will revive when placed upright on their feet. Plaintiff did not revive, however, and collapsed in the aisle of the bus. Sergeant Olson asked Plaintiff why he did not leave the bus, to which Plaintiff again

responded, "I will, I will," but did not move. The officers then removed Plaintiff from the bus and placed him in the back floor well of Officer Robinson's cruiser for transport to the county jail. No one was in the back of the cruiser with him.

Plaintiff awakened to find himself face down on the floor of a car. Officer Robinson told him that the car was a police cruiser, and Plaintiff asked why he was there. Officer Robinson, the driver of the vehicle, told him that he had refused to leave the bus. Plaintiff then explained to Officer Robinson that he was a diabetic coming out of an insulin reaction. Robinson, however, dismissed the remark, telling Plaintiff that diabetics do not come out of insulin reactions, and the police car proceeded to the county jail.

At the jail Plaintiff was offered assistance in leaving the cruiser in what he termed a "baiting" tone. He declined the assistance, wishing to protect himself from cuts and bruises to which diabetics and transplant recipients taking immunosuppressants are particularly vulnerable. With difficulty, he extricated himself from the well of the cruiser. The officers then began to walk him into the jail. Approximately fifteen paces from the car, one of the officers grabbed the Medic-Alert tag which had fallen from beneath Plaintiff's shirt, saying, "Hey, he really is a blind diabetic."

Plaintiff asked a jail officer if he would be charged and was told that the officer did not know. Although no charges were filed, the Court finds, based on Plaintiff's testimony, that he was put into a locked jail cell where he heard other inmates and worried for his safety.

At the jail, it was discovered that Plaintiff did not have all his luggage. Officer Noiles went to retrieve the missing pieces which contained Plaintiff's medication. Plaintiff was subsequently taken to the airport to catch the flight to Chicago, on which he was a scheduled passenger.

### Discussion

Plaintiff seeks compensatory damages under Maine law for false arrest, false imprisonment and excessive use of force by the officers.[1] Plaintiff also seeks both compensatory and punitive damages[2] under 42 U.S.C. § 1983 for violation of his civil rights. The Court finds that Plaintiff did suffer false imprisonment at the hands of the Defendant police officers and a violation of his civil rights by Officer Robinson and that he is entitled to recover damages for his injuries.

### State Law Claims

Under Maine law, false imprisonment "involves the unlawful detention or restraint of an individual against his will." *Nadeau v. State*, 395 A.2d 107, 116 (Me. 1978). A warrantless arrest, such as that made on Plaintiff, is lawful if a police officer's senses afford personal knowledge of facts sufficient to warrant a prudent and cautious officer in believing that a Class D or E offense has been or is being committed in his presence by the person arrested. 17–A M.R.S.A. § 15(1)(B) and (2).

**1.** The complaint sets forth separate causes of action on these three theories although under Maine law all three are encompassed by the tort of false imprisonment. The complaint appeared to use a temporal divider between its claims of false arrest and false imprisonment, asserting the false arrest to have taken place while Plaintiff was on the bus and the false imprisonment to have begun with placement of Plaintiff in the police cruiser. The excessive force claims were based on police use of force in restraining Plaintiff, removing him from the bus, and putting him in the cruiser. Realizing that the complex of events exist on a continuum for purposes of the general tort of false imprisonment, the Court has found it helpful to employ the distinctions set forth by Plaintiff in the complaint. Thus, as will be seen, the Court finds no liability for the portions of the offense labeled false arrest or excessive use of force, but finds liability for false imprisonment on the grounds that the arrest was maintained—not initially made—after it should have become clear that probable cause did not exist.

**2.** Plaintiff's claim for punitive damages under state law was dismissed. *See* Order, Civil No. 83–0028–P (D.Me. July 10, 1985).

■ Initially, when the officers boarded the bus, informed Plaintiff who they were and asked him to leave, his verbal response and subsequent failure to leave provided *probable cause* for prudent and cautious officers to believe that Plaintiff was committing a criminal trespass in their presence. *See* 17–A M.R.S.A. § 402 (1983). Therefore, the Court finds that the initial arrest of Plaintiff was proper, and Defendants are not liable on Plaintiff's claim of false arrest set forth in Count IX.

■ Plaintiff at trial also appeared to concede that the officers acted reasonably and prudently in handcuffing him since he resisted with flailing arms when they tried to rouse him. The Court agrees that the handcuffing of Plaintiff, whom Sergeant Olson had decided to arrest, although unfortunate, was acceptable police practice, for it ensured the safety of the officers and the other passengers in a situation which, at that point, contained unknown perils. Similarly, the evidence concerning removal of Plaintiff from the bus shows that the officers acted appropriately given the fact that Plaintiff could not walk. No claim of excessive force has been proven on these facts.

After Plaintiff had been restrained, however, and taken from the dark confines of the bus, there was ample opportunity for the police to calmly reassess the situation confronting them. It is clear from the record that the officers all assumed, on first encountering Plaintiff on the bus, that Plaintiff was inebriated or possibly under the influence of some sort of drug. In the face of a number of discordant facts, the officers never challenged or reassessed that assumption even though the fear for their safety and that of others was over, and there was time for reflection before transporting Plaintiff to the police station. Police work is not formulaic and requires constant reassessment of ongoing situations. Prudent and cautious police officers should not suspend their thought processes merely because it is easier to treat a situation as a familiar one. The public's servants may not, on assumption alone, treat the traveling citizen as a common drunk.

In this case, from the time he was first approached by the officers, Plaintiff continued to express verbally his willingness to leave the bus. He sat quietly with his hands at his sides and responded when Sergeant Olson initially spoke to him. There were no liquor bottles or cans or evidence of drugs on the bus. There was no odor of alcohol surrounding Plaintiff. The bus driver did not say that Plaintiff had been unruly—merely that he had said that he wanted to get off in Portland but did not get off. In fact, at all times Plaintiff expressed cooperation. He simply did not move. His only movements were the resistive flailings of his arms, which were prompted by Sergeant Olson's vigorous shaking. These movements, however, were not directed at the officers or threatening in any manner. When the officers tried to stand the handcuffed Plaintiff up, which Officer Robinson testified is standard procedure in dealing with inebriates, Plaintiff did not respond, as intoxicated individuals often do, by snapping out of his stupor. Instead, Plaintiff's knees buckled, and he collapsed.

■ These indicia that Plaintiff might not be drunk were sufficient to require prudent and cautious police officers, once Plaintiff was off the bus, to examine, at least cursorily, other possible explanations for his condition and conduct. They might have inquired of the bus driver or the other passengers concerning Plaintiff's behavior on the bus. They might have looked around Plaintiff's seat to check for items that might either confirm or dispute the initial hypothesis. If they had done so, they would not have found any bottles or cans that had contained alcohol. They would, however, have found Plaintiff's traveling bag, from which his white cane protruded. Further investigation, such as a pat-down, might have revealed Plaintiff's Medic-Alert necklace or bottle of reactose. The Court does not suggest that the officers should have conducted a protracted investigation; even a cursory inquiry

would have made the initial assumption seem less valid and perhaps prompted a thorough examination by a streetwise officer. Instead, upon removing Plaintiff from the bus, the officers immediately placed him in Officer Robinson's cruiser for transport to the county jail.[3]

The officers did not challenge their mistaken assumptions about Plaintiff even after he recovered in the back of the cruiser and informed Officer Robinson that he was a diabetic who had been in an insulin shock. Officer Robinson merely dismissed Plaintiff's remark, stating that diabetics do not come out of insulin shocks. Officer Robinson made no further effort to verify what Plaintiff had said. The record does not reflect that Officer Robinson relayed the information that he had received from Plaintiff to any of the other officers. If it was so relayed, none of the officers acted on it. No one asked Plaintiff about his condition when he arrived at the jail and, still handcuffed, he extricated himself, out of fear of further injury, from the well of the cruiser where he had been placed. If the officers had asked a few simple questions, the situation might have been clarified so that the officers could have offered valuable assistance to Plaintiff in a situation that was potentially very dangerous to his health. There was not, at the jail, any exigency that would have prevented them from doing so. Instead, not wanting to risk further injury to his wrists or to his vulnerable shins, Plaintiff declined what he described as an unsolicitous offer of assistance in getting out of the cruiser.

■ The Court does not with this decision prescribe a rule such as that sought by the Plaintiff, that officers be required in all instances to search for a Medic-Alert necklace immediately upon finding a semiconscious individual. Although such a rule would have positive effects for Plaintiff and others like him, the Court is persuaded by the police officers' testimony that such a practice might well be dangerous for the officers in many situations. It is clear to the Court, however, that the warrantless arrest statute mandating prudence and caution requires police officers to utilize all available information in deciding whether a crime is being or has been committed. If questions are raised by certain pieces of information, some reasonable inquiry is required by the officers so they may be reasonably certain that in making and maintaining an arrest they are acting properly.

Officer Noiles testified that he had had a basic first aid course at the Police Academy. Officer Robinson testified that he had been trained to look for medical emergencies. Sergeant Olson testified that he, too, had received such training, including specific instructions on people who might be having problems related to diabetes. Presumably, the training is designed specifically to permit officers to render aid in cases like the instant one. Such training can only be effective in practice, however, if the officers use the knowledge derived from their training in assessing the situations with which they are confronted in the field. Officer Robinson testified that there was no need to look for a medical emergency here because he thought that Plaintiff was drunk. That blind adherence to a preliminary assumption misses the point of the police training, i.e., that there may be many possible explanations for a given situation which must be realistically assessed.

■ The Court is certain that the officers, drawing on their training and the information easily available to them, could have determined before he was placed in the police cruiser that Plaintiff was not intoxicated but was in a medical crisis. From that point on, Plaintiff's detainment was unlawful and all of the officers are liable for false imprisonment.

---

**3.** Given the testimony of Stewart Hartford, the bus driver, that the officers did not push Plaintiff when they put him in the cruiser, the Court does not find that excessive force was used in placing Plaintiff in the cruiser. In this case it is not the use of force which gives rise to liability.

Plaintiff can, of course, recover for injuries sustained at the hands of the police, *see Prentiss v. Shaw*, 56 Me. 427 (Me.1869), during the false imprisonment even though the actual acts causing the injury do not give rise independently to liability.

*Liability Under § 1983*[4]

■ In his section 1983 claim Plaintiff asserts his Fourth Amendment right to be free from unreasonable seizures. Specifically, he asserts that the Fourth Amendment reasonableness requirement should be read in light of the fact that many people now wear Medic-Alert identification devices. In its discussion above, the Court has already performed the balancing test which Plaintiff urges here and has found that reasonableness does not require officers to check for Medic-Alert badges before they arrest semiconscious or unconscious individuals. Plaintiff's constitutional claim on this ground must, therefore, also fail.

■ Plaintiff also asserts that he had an Eighth Amendment right to the provision of adequate medical care, based on *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), in which the Court restated the "government's obligation to provide medical care for those whom it is punishing by incarceration." *Id.* at 103, 97 S.Ct. at 290. Plaintiff argues that in ignoring Plaintiff's medical condition after Plaintiff had informed him of it, Officer Robinson's "deliberate indifference to [his] serious medical needs," was conduct which the Supreme Court in *Estelle* had found actionable under section 1983. Although the Court thinks that the Eighth Amendment right set forth in *Estelle v. Gamble* is inapplicable here because the Plaintiff was not being punished by incarceration, the Court finds that Officer Robinson's conduct constitutes a violation of Plaintiff's substantive due process rights. A substantive due process claim is not a claim of procedural deficiency but, rather, a claim that the state's conduct is inherently impermissible, that the state's conduct was such as to shock the conscience of the court and, therefore, to violate the due process clause. *Schiller v. Strangis*, 540 F.Supp. 605, 614 (D.Mass.1982) (citing *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) ).

■ After having received training in medical emergencies, and having observed the circumstances of the Plaintiff's condition, Officer Robinson should have at least considered if Plaintiff was in a medical emergency. His total disregard for Plaintiff's well-being when Plaintiff stated his medical situation for him is indeed shocking. Robinson expressed no solicitude or interest in what Plaintiff, who at that point was face down in the well of the cruiser, had said. Rather, he dismissed Plaintiff's attempt to inform him with a flippant and incorrect observation. Robinson apparently never broached the subject with the other officers at the jail so that one of them might act on it. Although no great physical harm was occasioned by Officer Robinson's indifference, there might well have been, and unnecessarily so. Officer Robinson was in no danger, and the offense for which Plaintiff had been arrested was a minor one.

Defendants have tried to minimize Officer Robinson's callousness by arguing that it would have been impracticable for him to stop on the short trip from Dunkin Donuts to the jail. It is plain, however, that Officer Robinson did *nothing* to alleviate the situation. The Court finds, therefore, that Officer Robinson is liable to Plaintiff under 42 U.S.C. § 1983 for a violation of his civil rights. The Court finds no such violation on the part of the other Defendants.

*Damages*

Physical injury and mental distress are compensable under both state tort law and section 1983. Although because of his diabetes and the immunosuppressants Plaintiff was vulnerable to grave injury from abrasions, bruises or cuts, fortunately he did not suffer serious physical harm. He did, however, sustain some bruises and scrapes and considerable pain, for which he

---

**4.** In a previous ruling this Court held that Defendants had qualified immunity to suit under section 1983 to the extent that Plaintiff's claims are based on allegations of his arrest without probable cause. That ruling was addressed to Count IX of the complaint as to which, previously in this opinion, the Court has found no state law liability.

was treated for thirty days. Although it is impossible to pinpoint the exact timing of the occurrence of these injuries, the Court feels secure in finding that some of them at least occurred when Plaintiff was placed into the rear floor-well of the police cruiser.

A far more significant component of Plaintiff's damages, however, is the mental distress he suffered as a result of this incident. Healthy, sighted individuals often take their mobility for granted. Plaintiff, on the other hand, testified that after he became blind he took home instruction to learn Braille and how to travel with his disability. Unsatisfied with this training, he moved to Chicago to attend an extensive, residential course to enable himself to be more independent. At its completion, he felt comfortable traveling and traveled on public transportation without difficulty or anxiety around Chicago and from Chicago to his parents' home in Maine. Plaintiff testified that his experience at the hands of the Defendants has caused him great anxiety and made him less able to travel comfortably. For a period after the incident he was hesitant to use public transportation and took taxis when he needed to travel. Although he now uses public transport, he limits himself to the more rapid conveyances and travels only with great anxiety, sometimes deliberately raising his blood sugar to dangerously high levels to guard against a possible insulin reaction while traveling.

 The Court views this anxiety and fear as a very significant injury to a person whose mobility and independence were achieved with such great effort. For this harm and the physical injury he sustained, the Court deems it appropriate that he receive significant compensatory damages. The Court finds the Plaintiff's damages to be $25,000. *See Schiller,* 504 F.Supp. at 621. Each of the Defendants is to be held jointly liable because each of the bases of recovery is predicated on the same set of facts and the same injuries caused by the same actors. Officer Robinson's section 1983 violation caused only the same injuries that had already been caused by the three officers acting in concert. The fact that Officer Robinson is liable on both theories of recovery does not affect the amount of the recovery because the amount of compensatory damages available does not depend on the number of theories but on the extent of the injury. *Clark v. Taylor,* 710 F.2d 4 (1st Cir.1983).

### Punitive Damages

 The United States Supreme Court has ruled that punitive damages are available in section 1983 actions when the defendant's conduct involves reckless or callous indifference to the federally protected rights of others. *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). In determining that Officer Robinson's conduct shocked the Court's conscience, the Court essentially made the requisite finding for a punitive damages award. His conduct clearly showed callous indifference to Plaintiff's constitutionally protected rights. The Court finds an award in the amount of $500 to be appropriate for purposes of deterrence of such police conduct in the future.

Accordingly, it is adjudged that Defendants Noiles, Olson and Robinson are jointly and severally liable to the Plaintiff for damages in the amount of Twenty-Five Thousand Dollars ($25,000.00). In addition, Defendant Robinson is liable to Plaintiff for punitive damages in the amount of Five Hundred Dollars ($500.00).

So ORDERED; judgment to enter.