**UNITED STEELWORKERS OF AMERICA, et al., Plaintiffs,**

v.

**Ralph MILSTEAD, et al., Defendants.**

**No. CIV 84–649 TUC CLH.**

United States District Court,
D. Arizona.

July 6, 1988.
Supplemental Opinion Jan. 27, 1989.

Michael McCrory, Tucson, Ariz., for plaintiffs.

David L. Berkman, Tucson, Ariz., for defendants.

## MEMORANDUM OPINION AND ORDER

HARDY, District Judge.

This action was brought pursuant to 42 U.S.C. § 1983 by the United Steelworkers of America and 20 individual plaintiffs against 20 members of the Arizona Department of Public Safety. Summary judgment was granted in favor of the defendants against the United Steelworkers of America on the ground that it lacked standing. Summary judgment was also granted in favor of the defendants on many of the issues framed by the plaintiffs' complaint. The issues left for trial were whether there was an excessive use of force in the tear gassing of the people in the liquor store, whether plaintiffs were arrested without probable cause, whether conditions of de-

tention of the plaintiffs were unwarranted, whether commanders were liable for a plan that resulted in the plaintiffs being unable to find out who had arrested them, and whether qualified immunity was a defense. By the time trial had ended, 14 of the individual plaintiffs had settled their claims against the defendants and 12 of the defendants had been dropped from the case, either as a result of dismissal by the Court or voluntary dismissal by the plaintiffs. The case was tried to the Court. This memorandum shall constitute the Court's findings of fact and conclusions of law, as required by Rule 52 of the Federal Rules of Civil Procedure.

## FACTUAL BACKGROUND

On June 30, 1983, the United Steelworkers of America and other unions called a strike against Phelps Dodge Corporation at its copper mining operation in Morenci, Arizona. Phelps Dodge continued to operate by using non-striking salary workers and, later, by hiring "scabs." To get to and from work, many of these persons had to drive through Clifton, Arizona, on U.S. Highway 666. After shift changes at the mining operation, striking union members and their sympathizers frequently lined the highway in Clifton to taunt and throw rocks at persons who continued to work for Phelps Dodge. The county sheriff requested the assistance of the Arizona Department of Public Safety ("DPS") in maintaining order, and from time to time differing numbers of DPS officers were sent to Clifton for that purpose. Usually, they would be posted along the highway at intervals to discourage violence. There were occasional confrontations between strikers and their sympathizers and officers of DPS.

A particularly violent confrontation occurred in Clifton on May 5, 1983. DPS was surprised by the amount of violence. Three of its officers were injured and DPS vehicles were damaged. DPS was unable to exert control and restore order. The department's commanders concluded that its failure was the result of organizational, technical and equipment deficiencies including the nonexistence of a clear chain of command, lack of proper equipment (for example, plastic shields to ward off rocks), insufficient supplies of weapons, an ineffective type of tear gas (CN), failure to keep its forces mobilized as an effective tactical unit, and failure to have its officers mentally prepared. Drawing on lessons learned from the May 5 incident, DPS commanders made plans for an unusual occurrence task force ("the task force") with a clearly defined chain of command. Plastic shields were acquired for the protection of officers. Adequate supplies of tear gas and batons were accumulated.

DPS learned that the labor unions were planning to hold a rally at a park south of Clifton on June 30, 1984, from about 10:00 in the morning to 6:30 in the evening and that from 1,500 to 2,500 persons were expected to attend and that a group proposed to march from the rally through Clifton about 3:00 in the afternoon, which meant that the time of the march would coincide with the afternoon shift change in Morenci. Because the rally and the march were both considered to present a high potential for violence, DPS commanders formulated a detailed operations plan for the task force to cope with any violence that might arise from the rally or the march. The plan was to have a show of force sufficiently strong to persuade people to leave the area.

The operations plan called for assembling the task force in Safford, Arizona, by noon on June 29, for training, briefing and issuance of equipment. The task force would move on the following morning to an assembly area in Morenci.

The operations plan provided for a detention procedure. An arrested person was to be escorted by the arresting officer or officers to a pre-designated detention facility or area (in this case, a bus behind the line) where the suspect was to be identified with a numerical identifier; the suspect's name, date of birth, and the primary charge for which arrested were to be entered on a detention log; and a polaroid photograph of the arresting officer or officers and the suspect was to be taken and placed in the suspect's pre-numbered booking envelope. However, no provision was made for re-

cording what conduct had caused a person to be arrested. If prisoners could not be taken to the county jail, a temporary holding facility would be set up at "the Morenci football field." If prisoners had been contaminated with tear gas, hoses would be available at the field "to allow the prisoners to rinse off exposed body parts."

Under the operations plan, the use of tear gas could be authorized only by the task force commander or the tactical operations officer or, in an emergency, by a company commander. Once authority was given, the gas teams would have sole responsibility for its deployment.

On June 30, 1984, all grenades used by DPS contained CS, a more potent chemical agent than CN. There were two types of grenades. One, a rubber grenade, could be either thrown or launched. A charge fragmented the casing to release a cloud of tear gas dust. The other grenade was a canister. Heat generated within the canister emitted the tear gas over a period of from 25 to 35 seconds.

CS canisters are labeled with a warning "for outdoor use only." One reason is that while they do not emit flames, intense heat is generated which can ignite combustible materials. Another reason, particularly in small rooms, is that high levels of concentration of the gas can pose real physical dangers to occupants.

Gas team members were trained that before a chemical agent was to be introduced inside a building, an announcement should be made that the agent would be used within a specified period of time and that any occupants should leave before then. Slow burning canisters were not to be used in a situation where officers could not enter within a minute or two to minimize the fire hazard and to remove any persons who might have remained inside.

Pursuant to the operations plan, the task force assembled in Safford on June 29. Capt. William R. Reutter was designated as its commander. Its principal elements were a line company under the command of Capt. Norman Beasley, the commander of tactical operations, and a detention company under the command of Capt. Frederick J. Ayars. The line company consisted of two platoons under the command of Lt. Rodney D. Covey and Lt. Terrance DeBoer. A gas team was attached to each platoon. The detention company consisted of two platoons commanded by Sgt. Richard Gonzales and Sgt. Gadzick (who is not a party). Each platoon had 15 men, 12 of whom were assigned as arresting officers and three of whom were assigned as detention officers.

During briefing, officers were informed that there was a danger that persons in Clifton would be using firearms. Captain Reutter was aware that there was considerable tension among his officers and he assigned extra lieutenants to increase supervision.

It will be recalled that the operations plan provided an officer making an arrest would accompany the arrested person to the detention area where a photograph would be taken of him and the arrested person. Sometime on June 29, Capt. Beasley informed Capt. Ayars that he was dissatisfied with this procedure because it would cause him to lose officers from his line if they made arrests and went back to the detention area. Capt. Beasley wanted his officers to simply turn an arrested person over to members of the arrest team. Capt. Ayars was concerned that this would cause some problems in identifying the arresting line officers. However, the two commanders agreed to modify the procedure so that an arrested person would be turned over to members of the arrest team. At that time, the name or badge number of the arresting line officer was to be obtained. The individual badge number of each officer was taped on his helmet. When the arrest team delivered the arrested person to the detention team, a photograph was to be taken of that person and the arrest team member or members. Capt. Beasley and Capt. Ayars did not discuss how to obtain reports from the arresting line officers at a subsequent time.

Nothing untoward occurred during the rally at the park.

By agreement, DPS closed Highway 666, the main thoroughfare through Clifton, from 3:00 to 5:00 in the afternoon so that

the march could take place. About 200 people participated in the march. It ended about 5:00 without incident and the highway was reopened shortly thereafter.[1]

The march ended at the north end of Clifton in front of three buildings, which housed the People's Clinic, the Morales Nursery and the Clifton Liquor Store, on the west side of Chase Creek. An unimproved parking lot lies between the edge of Highway 666 and the eastern bank of the creek. Access to the three buildings is provided by a concrete bridge. The Clifton Liquor Store was a package liquor store where on-premises consumption of beer was also permitted. The plaintiff Alice Miller was its proprietor. She was about eight and one-half months pregnant. On June 30 she had sponsored a fish fry—a potluck affair—to honor a slow-pitch softball team. A number of persons had assisted her in cutting up and breading fish, which were cooked on a grill outside in front of the store. Ms. Miller had arranged for a mariachi band to provide entertainment. Throughout the afternoon numerous people had come to the store to participate in the fish fry, to purchase liquor and to talk with friends.

After listening to some speeches, most of the marchers left the area, probably to return to their vehicles at the south end of Clifton. About twenty or thirty persons, however, remained and lined up on both sides of Highway 666 to harass workers coming off shift from Morenci.

Col. Samuel A. Lewis, who was then the deputy director of DPS, and Capt. Reutter had observed the march from a vantage point in Morenci. After the march ended, they moved to another vantage point closer to Clifton, where they could hear taunts being shouted at persons in vehicles driving through Clifton and where Capt. Reutter thought that he heard rocks striking the sides of cars. They then drove into Clifton with the intention of talking to the people lined up along the highway to urge them to keep the peace. However, the

hostility of persons standing by the highway led Col. Lewis to believe that it would not be prudent for him to get out of his car to attempt to talk to the people. The two officers left Clifton and called for the task force to assemble on Highway 666 around the curve north of Clifton.

After the task force had assembled and had formed into a formation it advanced toward Clifton. Three DPS vehicles preceded the formation. Capt. Reutter was in the lead vehicle. Col. Milstead, the Director of DPS, was in another vehicle.

The mayor and vice-mayor of Clifton met the task force and requested that they be given a few minutes to attempt to disperse the people along the highway. Col. Milstead refused to grant permission because he felt that the two city officials were unable to control the people.

Capt. Reutter then used a public address system in his vehicle to announce, "I hereby declare this to be an unlawful assembly, and I command you in the name of the people of the State of Arizona to disperse immediately." He made this announcement twice. It was then repeated in Spanish by a Spanish speaking officer. The announcements were met by jeers.

The line company and the arresting teams of the task force then moved into formation in front of the vehicles and commenced marching toward the people assembled along the highway. About then, a stark naked man came streaking down the highway toward the formation, where he was immediately arrested and taken away. The task force began to be pelted by rocks, and authorization for the use of tear gas was given. Members of the task force were ordered to don their gas masks.

Rocks were being thrown at the task force by people on the right of the task force, across Chase Creek, and by people standing in the parking area before the Clifton liquor Store. Gas teams commenced launching tear gas grenades and firing batons to force the people back.

---

1. One must question the wisdom of authorizing a march at a time that necessarily would leave a large crowd of strike supporters assembled on Highway 666 at the very time that shifts were changing at Phelps Dodge.

As the task force advanced, the announcements were not repeated, nor was the public address system used to inform all persons in front of the task force, including those who were merely curious onlookers, that they were considered to be part of the unlawful assembly. Many people did not leave the scene until they were specifically told to by officers.

Tear gas was being used so copiously that large clouds of smoke were obscuring the vision of the task force. Officers knew that rocks were being thrown from the parking lot. They believed that persons throwing rocks were running into the liquor store.

At the time that the task force began its march, the fish fry had ended and the grill had been removed, although the band continued to play Mexican tunes in front of the store. It is unclear how many persons were inside the store when the announcements declaring an unlawful assembly and ordering persons to disperse were made. None of them heard the announcements.

When the task force reached the edge of the parking lot in front of the Clifton Liquor Store, there were persons standing on the sidewalk in front of the store. As the task force approached, the mariachis began to put away their musical instruments. Before they were able to do so, some of the officers of the task force came in a line directly toward the liquor store. At least one man, two women and a child were pushed inside. Others who had been in front of the store managed to flee to the south. Some sought refuge from the tear gas by going into the Morales Nursery, which was next door to the liquor store. No attempt was made to force them outside by the use of tear gas.

While he was standing near the door of the liquor store, the helmet of Officer Wells was knocked off. He was then struck on the head by a beer bottle that appeared to have come from inside the liquor store and that drew blood. His platoon commander, Lt. DeBoer, believed that anyone inside the store was a part of the unlawful assembly. Lt. DeBoer decided to force the evacuation of whoever might be inside the store. He was unwilling to send any of his men inside because he did not know how many persons were in there or whether anyone was armed. He also believed that his men were in a vengeful mood and might injure anyone they found in the liquor store. Accordingly, he directed Officer John Whetten, a gas team member, to tear gas the interior of the liquor store. Without giving the occupants of the store any warning that tear gas would be used and an opportunity to leave beforehand, Officer Whetten threw a tear gas canister through the window of the door of the liquor store. Someone inside opened the door and kicked the canister out. Lt. DeBoer kicked it back inside.

When the canister began to spew tear gas inside the liquor store, five persons fled to a walk-in refrigerator, others fled to a small restroom, and the others in the store fled outside through the store's only entrance. Every man who fled the store immediately after the tear gas began to spew forth was arrested.

Ms. Miller fled through the door. She was dazed by the tear gas fumes. As she was leaning against a pickup truck in the parking lot, she was observed by Officer Sabino J. Uliberry, who told her that she should not remain there, that it was dangerous to do so. When he attempted to take her by the arm and point her toward the south, Ms. Miller jerked herself away from him. He then directed two members of the arrest team to take her away. She was taken to the detention bus where she was handcuffed and placed inside. A short while later, after the detention bus had been driven back to the original assembly point, Ms. Miller was released from custody. A friend, a Clifton police officer, took her to his home in Morenci, where she spent the night.

The plaintiff Ray Aguilar was the father of Ms. Miller's unborn child. While he was a union member and had been active in the strike, on June 30 he was helping Ms. Miller with the fish fry. When the liquor store began to fill with gas he ran into a walk-in refrigerator, where four other persons had also fled. When he later left the

liquor store, he was not arrested. In the early morning hours of July 1, the Clifton police officer escorted him to the officer's home to reunite him with Ms. Miller. They were unable to return to their home in Clifton until about noon.

The plaintiff Jose M. Aguilar is Ray Aguilar's brother. Because of the fish fry, he worked at the liquor store on June 30. He heard someone say that the DPS was forming, and he went outside to take a look. He did not hear the order to disperse. Later, he heard that a man had taken off his clothes and he again went outside to look. When the canister began to spew tear gas in the liquor store, he ran out the door. He tripped or slipped and fell and was arrested by DPS officers. He was handcuffed with plastic handcuffs.

The plaintiff Weldon Copeland and his wife had attended the rally at the park. After the rally they went to the liquor store to talk to Ms. Miller and to drink a beer. By then, the march had ended. He heard someone exclaim, "There is a streaker going up the highway" and he went to the door to see the streaker. He then resumed drinking his beer. As he was fleeing from the liquor store he was arrested. While he was being taken to the detention bus, he was jabbed with a night stick.

The plaintiff Raymond Gaxiola had been at the union rally between 1:00 and 4:00 o'clock that afternoon. He could not return to his home in Morenci because Highway 666 had been closed for the march. He went to the Clifton Liquor Store for the fish fry. When the tear gas began to spew, he attempted to get into the walk-in refrigerator in the rear. It was too crowded with people. He then tried to get into the restroom. It, too, was too crowded. One of the persons there was a child, Terry Villescas. He picked her up to carry her out. As he approached the doorway, an officer was standing there beating on the door with either his shield or his baton. He put the child down because he was afraid they might be beaten. He was arrested and dragged to the bus.

The plaintiff John Stallings lived across the road from the Clifton Liquor Store.

During the strike he had been a picket captain, who was responsible for seeing that the picket line at the mine was manned during certain hours. He had been at the union rally earlier in the day and had then gone home. About 4:00 o'clock in the afternoon he and a friend went outside to watch the activities along the highway and he saw the DPS approaching. He crossed the highway to inform Ray Aguilar that he would be unable to check the picket line. As he did so he heard "State of Arizona" but did not hear what else was said because of the noise. When the liquor store was gassed, he ran out. Someone threw him to the ground, a choke hold was applied, his arms were pulled behind him and he was taken to the bus.

Macedonio Armijo, his wife and children were driving north to Morenci. He approached Capt. Reutter and requested that he be permitted to drive on. Capt. Reutter refused. When Armijo insisted, Capt. Reutter arrested him and turned him over to an arrest team without seeing to it that the arrest team had recognized him and had obtained his badge number.

The procedure developed by Capt. Beasley and Capt. Ayars for identifying line officers who made arrests broke down completely. When line officers delivered arrested persons to them, the arrest teams failed to note the badge numbers of the line officers and could not recognize them because they were wearing gas masks. Consequently, there was no record of who had arrested whom. No photographs were taken of the persons arrested. Captain Ayars was stationed near the detention bus and was aware that no photographs were being taken. Sgt. Gonzales was also aware that photographs were not being taken and that the names or badge numbers of arresting officers were not being obtained. He made no effort to have his arrest team members comply with the plan.

All of the persons who were arrested were handcuffed with their hands behind their backs. Metal handcuffs were placed on Mr. Copeland. Plastic handcuffs, also known as flexi-cuffs, were placed on Mr. Jose Aguilar, Mr. Gaxiola and Mr. Stall-

ings. Once placed, flexi-cuffs cannot be loosened and they can be removed only by cutting them off.

Not long after all of the present plaintiffs had been arrested, the task force withdrew to its original assembly point around the curve on Highway 666 in order to effect a resupply of tear gas and batons. It then again advanced into Clifton. In the meantime, however, members of the mob had erected a number of roadblocks consisting of boulders, lumber, car bodies, and tires. The tires were set afire, and some type of flammable liquid was also poured across the highway and ignited. The task force cleared the first roadblock. By then darkness was falling. The task force commanders concluded that not only would it be hazardous to attempt to clear the roadblocks in the dark, but heavy equipment was probably required.

Highway 666 was the only route through Clifton that could have been safely traveled by the detention bus to reach the county jail. The task force commanders concluded that it would be best to hold the prisoners in Morenci until the highway could be cleared.

After Mrs. Miller was released, Capt. Ayars instructed Sgt. Gonzales to take the prisoners to a school ground in Morenci where arrangements had been made for water to enable the prisoners to wash themselves. When they reached the school ground, the prisoners were placed in a batting cage. At the direction of another DPS sergeant, they were taken from the batting cage, one by one, still handcuffed, and washed with a high-powered hose—powerful enough to knock at least one of the prisoners off his feet. Sgt. Gonzales did nothing to intervene.

The prisoners were then taken to the Morenci Club in Morenci, the original assembly point for DPS. Officers were assigned by Sgt. Gonzales to fill out a short arrest form and booking slip charging each prisoner with unlawful assembly. No attempt was made to question any prisoner to determine what he or she had been doing immediately before arrest. The prisoners were not permitted to make telephone calls.

Officer Jack Lane was one of the officers filling out arrest reports and booking slips. Sgt. Gonzales instructed him to charge all of the persons with unlawful assembly. It was also Officer Lane's understanding that no one would be arrested unless the person had fought with officers, in which case the person was also to be charged with riot.

About eight o'clock that evening, Capt. Ayars was informed by Sgt. Gadzick that the documentation of the prisoners lacked the identification of the arresting line officers. Capt. Ayars told Sgt. Gadzick and Sgt. Gonzales to find those officers and get the information. An announcement was made over a public address system that arresting line officers report to the detention team. A few reported. None reported regarding any of the present plaintiffs. No effort was made to have the prisoners line up, and to have each line officer look at them and report whether he or she had arrested any of them.

About nine o'clock that night Capt. Ayars left the Morenci Club to go to the emergency command center to discuss the formation of Company B in Safford, which would be commanded by him. He returned to the Club about 11:00 o'clock and told Sgt. Gadzick that he was in charge of the detention company. He instructed Sgt. Gadzick to continue to gather the facts, make prisoners comfortable, and see that they were fed. He also instructed Sgt. Gadzick that if evidence of other charges was not available prisoners should be charged with unlawful assembly.

After the prisoners had been at the Morenci Club a while, they were moved into a room that was described as a cloak room and a storage room. It was windowless and had a door at each end. One door was within a few feet of the front entrance of the Morenci Club. That door was kept open at all times and an officer was stationed there to keep an eye on the prisoners. They were seated on metal folding chairs. Some cushions were brought in so that some could lie down to sleep, but no more than three or four were able to lie down at any time.

One reason for moving the prisoners into the closet was that the DPS officers would be sleeping in the club's assembly hall that night. They had sleeping bags and consequently the temperature of the club was turned down so that they could sleep more comfortably. A result was that the prisoners, who were still in wet clothing, were uncomfortable because of the cold.

Many were also uncomfortable because their handcuffs were too tight. Handcuffs should be only tight enough that a person cannot get his or her hands out of them, and they should not be so tight as to cut off circulation.

It was DPS policy to keep arrested persons handcuffed until they were delivered to a jail. One who is handcuffed is less likely to attempt to escape. A handcuffed prisoner who attempts to escape can be more easily subdued.[2]

When Mr. Gaxiola observed the badly swollen hands of another prisoner, he complained to the guards. Thereafter, the handcuffs were loosened or, in the case of flexi-cuffs, cut off and replaced with others. When Mr. Copeland's handcuffs were loosened, his hands and wrists were so numb he could not tell that the handcuffs had been loosened.

About 11:00 o'clock that night the handcuffs were removed from the prisoners so that they could eat sandwiches. After they had eaten, they were again handcuffed with their hands behind their backs. Metal instead of plastic handcuffs were placed on Mr. Jose Aguilar. Later in the night, the prisoners were handcuffed with their hands in front.

The following morning, July 1, Highway 666 was cleared and the prisoners were transported to the Greenlee County Jail, where they were booked. The handcuffs were not removed from any of the plaintiffs until they reached the county jail. Initially, bail was fixed at $1,000 for each of the plaintiffs. Later in the day, they were released from custody on their own recognizance. Complaints were filed accusing all the plaintiffs except Ms. Miller of unlawful assembly, a misdemeanor, and riot, a felony. Officer Lane verified each of the complaints. All of the charges were subsequently dismissed before a preliminary hearing was held.

Ms. Miller suffered the physical effects of having been tear gassed, which irritated not only the tissues of her eyes but also her skin. She was humiliated by having been arrested, handcuffed and taken away in the detention bus. She was particularly distressed by concern of what effect the tear gassing may have had upon her unborn child. Fortunately, the child was born three days later—a healthy, normal child.

Ray Aguilar also suffered some physical effects from the tear gas. He was distressed because he did not know what had happened to Ms. Miller or to her unborn child.

Three of the plaintiffs, Jose Aguilar, Weldon Copeland and Ramon Gaxiola, suffered essentially the same injuries. They were hosed down, they were tear gassed, they were handcuffed too tightly, they were held in custody long after it was clear that no one had any firsthand knowledge that any one of them had committed a crime, and they were falsely accused of unlawful assembly and riot.

Jose Aguilar's hands were numb for about two months. His shoulders were sore for about a week. He had some burns and cuts from the plastic handcuffs. Mr. Copeland's hands, wrists and arms hurt for about a week after his arrest. Mr. Gaxiola had pain in his wrists for about a week after his arrest.

Mr. Stallings presents a different picture. His life has been chaotic. As a child he was subjected to frequent physical and sexual abuse by his father and friends of his father. At one time he was forced to be a male prostitute. The family moved frequently. His education ended at the seventh grade. Throughout his life, he has frequently abused liquor and prescription

---

**2.** Nonetheless, one prisoner with his hands handcuffed behind his back successfully escaped from the detention bus in Clifton.

drugs. Mr. Stallings was employed by Phelps Dodge in October of 1978. On February 27, 1979, while working, his hand was pulled between a belt and a roller fracturing two fingers and severely lacerating the hand. Seven months passed before his physician felt that he was completely healed. On March 31, 1980, he voluntarily caused himself to be admitted to a psychiatric hospital because of feelings of depression. On December 7, 1982, he was referred to the psychiatric hospital by a Phelps Dodge doctor because he was anxious and depressed, and he remained there for ten days. His physicians concluded that his problem stemmed from headaches caused by psychogenic factors and by excessive use of analgesic drugs. On his request, he was released from the hospital on December 17, 1982.

During the strike, Mr. Stallings was made a picket captain, which caused him considerable pride and feelings of wellbeing. All of this came crashing down when he was arrested. He felt that he was being abused all over again. A choke hold caused neck pain and difficulty in breathing for about a week. Tight handcuffs reactivated the injuries to his hand as a result of the accident on February 27, 1979. Numbness in his hands persisted for over a year after his arrest and the strength of his left arm was markedly less than the strength of his right. He also required extensive psychological counseling. He incurred expenses totaling $4,245.65 (including travel expenses for medical treatment and psychological counseling.)

## DISCUSSION

■ "Every person who under color of [state law] subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the person injured in an action at law...." 42 U.S.C. § 1983. There is no question that the defendants were acting under color of state law. The question is whether they deprived the plaintiffs of any "rights, privileges, or immunities secured by the Constitution." It is no

defense that a defendant had no specific intent to cause a deprivation of civil rights. *Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

### 1. *Excessive Force*

As the result of pretrial rulings, plaintiffs' claims of excessive force survive against only Lt. DeBoer and Officer Whetten.

■ A claim of excessive use of force in making an arrest is actionable under § 1983 as a violation of the Fourteenth Amendment right to substantive due process, *Maddox v. City of Los Angeles,* 792 F.2d 1408 (9th Cir.1986); *Rutherford v. City of Berkeley,* 780 F.2d 1444 (9th Cir. 1986), or as an unreasonable seizure in violation of the Fourth Amendment (through the Fourteenth Amendment), *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *Smith v. City of Fontana,* 818 F.2d 1411 (9th Cir.1987); *Robins v. Harum,* 773 F.2d 1004 (9th Cir.1985); *McKenzie v. Lamb,* 738 F.2d 1005 (9th Cir. 1984).

■ A due process violation cannot be based upon negligent conduct. *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986); *Rinker v. County of Napa,* 831 F.2d 829 (9th Cir.1987). The conduct must be "intentional, unjustified, brutal, and offensive to human dignity." *Meredith v. State of Arizona,* 523 F.2d 481 (9th Cir. 1975); *Rutherford v. City of Berkeley,* 780 F.2d 1444 (9th Cir.1986).

■ Where it is alleged that excessive force resulted in an unreasonable seizure, the "reasonableness of force should be analyzed in light of such factors as the requirements for the officers' safety, the motivation for the arrest [or detention], and the extent of the injury inflicted." *Smith v. City of Fontana,* 818 F.2d at 1416 (quoting from *McKenzie v. Lamb,* 738 F.2d 1005, 1011 (9th Cir.1984).

■ The conduct of Lt. DeBoer and Officer Whetten in tear gassing the liquor store was indeed intentional and offensive to human dignity, insofar as innocent persons were inside. However, it cannot be categorized as unjustified. Lt. DeBoer reasonably believed that there were persons inside the liquor store who had been throwing rocks, bottles or other objects at the DPS officers. He had been instructed not to let such persons get behind the task force. He could have ordered officers to enter the liquor store and clear it out, but he had no idea who was in there and what resistance they might offer. He had a well-founded belief that his officers might react violently to any resistance. Nor can the tear gassing be considered a brutal act. None of the plaintiffs suffered serious injuries.

■ Nor was the use of tear gas to effect the arrest of the plaintiffs contrary to the reasonableness requirement of the Fourth Amendment. As mentioned above, Lt. DeBoer was concerned for the safety of any officers he might send into the liquor store and none of the plaintiffs was really seriously injured by the tear gas. Finally, the motivation for the use of the tear gas was not to punish anyone but to force persons suspected of having attacked the task force to leave the building. Quickly, after the tear gas was thrown into the building, officers were sent inside to clear it out.

### 2. *False Arrest*

■ The standards for arrest and for detaining an arrested person are the same—probable cause. *Gerstein v. Pugh,* 420 U.S. 103, 120, 95 S.Ct. 854, 866, 43 L.Ed.2d 54 (1975). A police officer may not arrest or detain a person without an arrest warrant unless there is probable cause to believe (a) that a crime has been committed, and (b) that the person in question has committed that crime. Probable cause exists if the facts and circumstances known to the officer at the time that the person was arrested and of which he had reasonably trustworthy information, are sufficient to warrant a prudent or careful person in believing that the suspect has committed a crime. *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). The mere fact that a person has been arrested does not establish probable cause for that arrest. *United States v. Perez–Castro,* 606 F.2d 251 (9th Cir.1979).

■ A person cannot be arrested and detained simply to allow a law enforcement agency to complete its investigation. *Sanders v. City of Houston,* 543 F.Supp. 694, 703 (S.D.Tex.1982), *aff'd* 741 F.2d 1379 (5th Cir.1984).

■ While a plaintiff's burden of proving a false arrest never shifts, once a warrantless arrest is established, the burden of going forward with the evidence to establish probable cause passes to the defendant. *Gilker v. Baker,* 576 F.2d 245, 246 (9th Cir.1978). No evidence was presented by the defendants to establish probable cause for the arrest and detention of any of the plaintiffs except Ms. Miller.

■ An arrest is a seizure for Fourth Amendment purposes and continues as long as the arrested person remains in the custody of the arresting officers. *Robins v. Harum,* 773 F.2d 1004 (9th Cir.1985).

■ There was no probable cause to arrest any of the men who were forced out of the liquor store. None was identified as having remained in the parking lot in front of the store after the announcement of an unlawful assembly and order to disperse had been given. None was identified as being one of the persons who were throwing rocks, bottles and other objects at the DPS officers. Any suspicion that one of them had been a part of the unlawful assembly or had participated in the riot simply because he was in the liquor store was unreasonable. Absent explicit instructions to the contrary, any of the plaintiffs who had been outside at the time of the command to disperse would have complied by going into the liquor store and staying there.

■ Officer Uliberry had probable cause to arrest Ms. Miller. She was in the area of the unlawful assembly. She did not leave when he directed her to do so.

### 3. Conditions of Confinement

■ The legal standard for conditions of confinement is whether the conditions are "reasonably related to a legitimate governmental objective." *Bell v. Wolfish,* 441 U.S. 520, 539, 99 S.Ct. 1861, 1874, 60 L.Ed. 2d 447 (1979). Detaining the prisoners at the Morenci Club and keeping them handcuffed served legitimate government objectives. To have attempted to transport the prisoners to the county jail on the night of June 30 could reasonably have been expected to expose them and the officers transporting them to the risk of injury. Keeping the prisoners handcuffed was necessary to prevent them from attempting to escape.

Nonetheless, while none of the defendants can be held liable for the conditions under which the plaintiffs were confined, those conditions are elements of damage that plaintiffs may have sustained as a result of false arrest.

### 4. Liability of Supervisors

The operations plan provided for a procedure that would have paired any person arrested with the officer making the arrest. Even as modified by Capt. Beasley and Capt. Ayars on June 29, the procedure would have enabled identification of any officer who had arrested a person. However, the heat of battle caused the procedure to fail completely, and Capt. Ayars knew it yet did nothing to attempt to compel compliance.

Later in the evening, Capt. Ayars was aware that the arrest teams were unable to identify the arresting line officers. While he informed Sgt. Gadzick and Sgt. Gonzales to obtain the information, he never again, during the time that he continued to be the commander of the arrest team, attempted to determine if the arresting officers had been identified, and if not, to consider other procedures to effect identification.

■ Once it was clear that none of the plaintiffs could be identified as having participated in the unlawful assembly or the riot, there was no longer a basis for continuing their detention. They should have been released from custody.

While there was no evidence that Capt. Reutter was aware of the identification problem, he reasonably should have been. He had arrested Mr. Armijo and delivered him to an arrest team, but he did not confirm that the arrest team had recognized him and had obtained his badge number.

■ A supervisor may be liable under § 1983 for permitting proper procedures to be ignored or failing to adequately supervise personnel. *See McClelland v. Facteau,* 610 F.2d 693, 696 (10th Cir.1979); *Sims v. Adams,* 537 F.2d 829, 831 (5th Cir.1976).

### 5. Good Faith Defense

■ A law enforcement officer's reasonable good faith belief that he had probable cause to arrest and detain a person is a defense to a § 1983 action. *See Jensen v. Stangel,* 762 F.2d 815, 817 (9th Cir.1985); *Smiddy v. Varney,* 665 F.2d 261, 266 (9th Cir.1981). The test of good faith is an objective one. "It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity...." *Scheuer v. Rhodes,* 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1691–92, 40 L.Ed.2d 90 (1974); *see also Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 2736–37, 73 L.Ed.2d 396 (1982).

■ The officers who arrested the plaintiffs could not reasonably believe that the persons inside the liquor store were a part of the unlawful assembly. To repeat, anyone inside the store could reasonably have been in there in compliance with the order to disperse. The defendants have not presented any evidence that would suggest that any of the plaintiffs were involved in the rioting.

Later in the evening when no one came forward to identify any of the plaintiffs as one of those who failed to comply with the order to disperse or was involved in resisting the task force, the officers responsible for the detention of the plaintiffs reasonably should have recognized that there was no basis for their continued detention.

### 6. *Liability of the Defendants*

Lt. DeBoer's decision that tear gas should be used to force anyone in the liquor store to leave the building was justified and reasonable. In the circumstances, the use of force was not excessive. Judgment must be entered in his favor and against the plaintiffs on the excessive force claim.

Officer Whetten, who had the final authority to determine whether tear gas should be thrown into the liquor store, had been trained that in such circumstances, the occupants should be first warned and given a chance to leave the premises. In the circumstances, his failure to give a warning was a lack of due care. The Fourteenth Amendment is not violated by negligence. *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Accordingly, judgment must be entered in his favor and against the plaintiffs on the excessive force claim.

Because the facts as found by the Court establish that as a matter of law Officer Uliberry reasonably believed that he had probable cause to arrest Ms. Miller, judgment must be entered in his favor and against Ms. Miller on her claim for false arrest.

Officer Lane's role at the detention center was a clerical one: he filled out arrest forms as directed by Sgt. Gonzales. He reasonably believed that no one would have been arrested unless that person had fought with DPS officers. Judgment will be entered in favor of Officer Lane and against all plaintiffs.

Capt. Reutter, Capt. Ayars and Sgt. Gonzales must be held liable to Mr. Jose Aguilar, Mr. Copeland, Mr. Gaxiola and Mr. Stallings for their continued wrongful detention. While none of the three officers was aware of the circumstances under which any of the four plaintiffs had been arrested, they knew, or should have known, that procedures designed to pair arrested persons with arresting officers had not been followed. Yet they did nothing about it. Later in the evening, when it reasonably should have been clear that no one could identify the plaintiffs as having participated in any unlawful conduct, they should have released plaintiffs from custody.

### 7. *Damages*

The measure of damages for false arrest is such sum as will fairly and reasonably compensate the injured person for injuries caused by the defendant's wrongful act. *Schulz v. Lamb*, 591 F.2d 1268 (9th Cir.1978). Damages may be awarded for both physical and mental injury. *Whirl v. Kern*, 407 F.2d 781, 797 (5th Cir.1969). Mental injury (or emotional distress) includes embarrassment, humiliation and anxiety. *See Moolenaar v. Atlas Motor Inns, Inc.*, 616 F.2d 87, 90 (3rd Cir. 1980). A plaintiff may recover for injuries sustained during false imprisonment even though the actual acts causing the injury do not give rise independently to liability. *Thompson v. City of Portland*, 620 F.Supp. 482, 487 n. 3 (D.Me.1985).

Considering that they were arrested without probable cause, handcuffed tightly with their hands behind their backs, taken to a ball field and hosed down, forced to spend the night wearing wet clothing in a cold room, kept handcuffed for more than 12 hours (except for the few minutes that they were removed to permit them to eat a light meal), and suffered embarrassment, anxiety and fear, Mr. Jose Aguilar, Mr. Copeland and Mr. Gaxiola are entitled to $10,000 each as damages.

Mr. Stallings is entitled to something more. A defendant must take a plaintiff as he finds him. *Lutz v. United States*, 685 F.2d 1178 (9th Cir.1982). When a defendant's wrongful act causes injury,

he is fully liable for the resulting damage even though the injured plaintiff had a pre-existing condition that made the consequences of the wrongful act more severe than they would have been for a normal person. *Maurer v. United States,* 668 F.2d 98 (2d Cir.1981). A choke hold caused greater injury to Mr. Stallings than was suffered by the other plaintiffs. The handcuffs aggravated the injury to his wrist as a result of the industrial accident in February of 1979. An emotionally unstable person to begin with, he had to have extensive psychological counseling because of the emotional trauma of the false arrest and detention. He incurred expenses of $4,245.65 for counseling, treatment and travel to obtain counseling and treatment. He is entitled to recover damages in the amount of $17,750.

### 8. *Punitive Damages*

█ The purpose of punitive damages is to punish a defendant for willful or malicious conduct and to deter others from similar behavior. *Memphis Community School District v. Stachura,* 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249. The continued improper detention of the plaintiffs was not a product of maliciousness. Rather, it was more a matter of inertia. Bearing in mind that none of the defendants being held liable had witnessed the arrests of the four men, it is not unreasonable to assume that they had a good faith belief that there was probable cause for the arrests and that eventually the causes for the arrests would be established.

### ORDERS

IT IS ORDERED as follows:

1. That the clerk enter judgment in favor of the defendants Beasley, DeBoer, Lane, Uliberry and Whetten and against the plaintiffs on all counts.

2. That the clerk enter judgment in favor of the plaintiff Jose Aguilar and against the defendants Ayars, Gonzales and Reutter in the sum of $10,000 on the false arrest counts.

3. That the clerk enter judgment in favor of the plaintiff Copeland and against the defendants Ayars, Gonzales and Reutter in the sum of $10,000 on the false arrest counts.

4. That the clerk enter judgment in favor of the plaintiff Gaxiola and against the defendants Ayars, Gonzales and Reutter in the sum of $10,000 on the false arrest counts.

5. That the clerk enter judgment in favor of the plaintiff Stallings and against the defendants Ayars, Gonzales and Reutter in the sum of $17,750 on the false arrest counts.

### SUPPLEMENTAL OPINION

On July 21, 1988, the Court issued its Memorandum Opinion and Order which, among other things, exonerated the defendants DeBoer, Lane, Uliberry and Whetton from liability on all counts and declined to award punitive damages. The plaintiffs Jose Aguilar, Rey Aguilar, Weldon Copeland and Alice Miller have filed a motion for reconsideration. They seek to have the Court amend its judgment to include certain additional factual findings and to award damages to them on their claims of excessive force in the tear gassing of the liquor store, to award Alice Miller damages for false arrest and to award punitive damages to Jose Aguilar and Weldon Copeland.

### ADDITIONAL FINDINGS OF FACT

The plaintiffs have requested a number of additional findings of fact, most of which are not material to a resolution of the issues. However, the following additional findings of fact are appropriate:

Task force commanders were instructed that if the task force marched through Clifton, persons in buildings along the line of march should be requested to leave them voluntarily.

The Clifton Liquor Store was a small, L-shaped single room which was less than twenty feet square on the longer side and had a ceiling of approximately seven feet. The store had only one door.

Until Officer Wells was injured by a bottle thrown from inside the liquor store, Lt.

DeBoer had not intended to force evacuation of the store.

When Lt. DeBoer directed Officer Whetton to teargas the liquor store, he had no intention of arresting anyone; he simply wanted to clear the building.

Lt. DeBoer knew that a gas canister could ignite a fire and that the use of tear gas in a confined area could cause breathing problems. He had intended to enter the liquor store a few moments after the gassing, and in fact, he did enter the store and found no one there.

Lt. DeBoer gave no consideration to the likelihood that there were persons in the store who had not been involved in the events outside.

Officer Lane was instructed to show himself or Sgt. Gonzales on the arrest forms as the arresting officers.

Sgt. Gonzales and Officer Lane knew that the arrest forms were to be used to document the continued detention of the prisoners and to initiate subsequent felony and misdemeanor prosecutions.

After the teargassing, Ms. Miller's unborn child quit kicking for approximately six hours.

### EXCESSIVE USE OF FORCE

Had Lt. DeBoer concluded that all persons inside the liquor store should be arrested for conduct outside and that using tear gas to force them out of the store presented the least risk to his men, his decision may have been justified. But he never intended to arrest anyone who was in the store. All he wanted to do was force everyone in there to leave. He gave no consideration to the likelihood that there were persons inside who had not been involved in the events outside. He was aware of the potential dangers of using a gas canister in a confined area. In view of the probability for injury, his failure to give anyone inside the opportunity to leave before tear gas was used was a reckless disregard of the right of anyone in the building not to be injured.

The case against Officer Whetton is even stronger. He was using a tear gas canister that was plainly labeled "for outdoor use only." He knew that the canister generated extreme heat and could pose real physical dangers if used inside buildings. He had been trained never to introduce tear gas into a building without first giving any occupants the opportunity to leave. He, too, acted in reckless disregard for the rights of others.

### FALSE ARREST OF MILLER

The Court disagrees with Miller's contention that she was falsely arrested by Officer Uliberry. True, she may have been improperly forced out of her store and was frightened and confused. There is no evidence that Officer Uliberry was even aware that she had come from the store. He attempted to have her move away, she refused, and he then arrested her. He had probable cause for the arrest.

### OFFICER LANE'S LIABILITY FOR FALSE ARREST

In filling out arrest forms, Officer Lane was complying with orders given to him by Sgt. Gonzales. The officer reasonably believed that all of the plaintiffs had taken part in the disturbance earlier in the day. He also reasonably believed that the officers who had firsthand knowledge of the conduct of each of the plaintiffs would eventually be located and substituted as the complaining witnesses. In *Vele v. White*, 703 F.2d 147, 152 (5th Cir.1983), the court held that a police officer is entitled to the defense of good faith when a superior orders him to make an arrest and there is no indication that the officer bore any personal ill-will toward the arrestee. The court stated "it would not be fair to force [the officer] to either violate a direct order or else stop and interrogate [his superior] as to the reasons for his order, at the risk of being held liable for damages for an unlawful arrest." The same reasoning applies here.

### DAMAGES

Having determined that Lt. DeBoer and Officer Whetton are liable to

plaintiffs for injuries sustained by them as a result of the teargassing, the damage to be awarded each of the plaintiffs must be determined. Generally, a wrongdoer is liable for the entire damage if a subsequent injury is the natural result of the original injury, but if the subsequent injury is attributable to a distinct intervening cause, the wrongdoer is liable only for the original injury. *Henderson v. United States,* 328 F.2d 502, 504 (5th Cir.1964). Mr. Jose Aguilar and Mr. Copeland were arrested immediately upon fleeing the liquor store. Ms. Miller was arrested shortly after she fled the store. However, there is no evidence that they were forced from the store so that they could be arrested. Lt. DeBoer's unrebutted testimony was that he had no intention of arresting anyone; he simply wanted to clear all people out of the building. Consequently, he and Officer Whetton can be held liable only for the injuries that plaintiffs sustained directly as a result of the teargassing.

Damages of $1,000 will be awarded to each of the three male plaintiffs against Lt. DeBoer and Officer Whetton. Ms. Miller is entitled to considerably more. She was forcibly ousted from her place of business and was not permitted to return until the following day. She was fearful that she might lose her unborn child, or that it might suffer injury as a result of the teargassing. She was humiliated by the fact that she had been arrested, without cause so far as she was concerned. Her damages will be fixed at $15,000.

### PUNITIVE DAMAGES

Punitive damages may be awarded in a Section 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others ... even when the underlying standard of liability for compensatory damages is one of recklessness." *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). The Supreme Court also noted that punitive damages "are never awarded as of right, no matter how egregious the defendant's conduct" but required a consideration of whether the wrongdoer's conduct merited a punitive award. 461 U.S. at 52, 103 S.Ct. at 1638.

The Court finds that holding Lt. DeBoer and Office Whetton liable for their conduct and assessing damages against them is a sufficient deterrent against further action and that an award of punitive damages is therefore not necessary. The same reasoning applies to the Court's refusal to assess punitive damages against the other defendants.

IT IS ORDERED granting the motion for reconsideration to the following extent:

1. That the Clerk enter judgment in favor of the plaintiff Jose Aguilar and against the defendants DeBoer and Whetton in the sum of $1,000 on the claim of violation of his Fourteenth Amendment rights.

2. That the Clerk enter judgment in favor of the plaintiff Rey Aguilar and against the defendant DeBoer and Whetton in the sum of $1,000 on the claim of violation of his Fourteenth Amendment rights.

3. That the Clerk enter judgment in favor of the plaintiff Weldon Copeland and against the defendant DeBoer and Whetton in the sum of $1,000 on the claim of violation of his Fourteenth Amendment rights.

4. That the Clerk enter judgment in favor of the plaintiff Alice Miller and against the defendants DeBoer and Whetton in the sum of $15,000 on the claim of violation of her Fourteenth Amendment rights.

IT IS FURTHER ORDERED otherwise denying the motion for reconsideration.